UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
~ Northern Division ~

TIMOTHY E. KOCH, et al.,

        Plaintiffs

v.

SPECIALIZED CARE SERVICES, INC., et al.,

        Defendants.

CIVIL ACTION NO. 04-1395 (AMD)

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION
TO COMPEL PRODUCTION OF DOCUMENTS AND RESPONSES TO
<u>INTERROGATORIES THAT DEFENDANTS CLAIM ARE PRIVILEGED</u>**

Plaintiffs maintain that Defendants' story that Tim Koch voluntarily resigned on March 5, 2004 is a lie designed to rid the Defendants of Tim Koch and his family shareholders without paying them the millions of dollars they were owed. In spite of Defendants' effort to downplay the involvement of their in-house attorneys, there can be no doubt that these lawyers were integrally involved in every aspect of this scheme. On March 5, Tim Koch told the Defendants that he was willing to "negotiate a surrender." Then a flurry of meetings, phone calls and emails with the attorneys ensued. Five days later Tim Ryan, an in-house attorney, wrote Tim Koch and detailed Defendants' story that Tim Koch resigned. Shortly thereafter, after further consultations with the attorneys, Dr. Migliori locked Tim Koch out of his office.

Based on the latest privilege log that Defendants *just produced* on December 10, 2004, Plaintiffs now have learned that Defendant Rob Webb and the Human Resources Department were asking for and receiving advice from the in-house attorneys about Tim Koch's employment

agreement *the day before* the fateful March 5 meeting where Koch allegedly "resigned."[1] Furthermore, Defendants' original privilege log reveals that the Defendants and their attorneys were anticipating litigation with the Kochs as early as March 5, 2004. For example, the Plaintiffs' privilege log claims privilege for three separate documents authored by Rob Webb on March 5. Two of these documents are described as "Summary of information regarding T. Koch for attorney for purpose of providing legal advice in anticipation of litigation." The third document is described as "Notes prepared for counsel regarding conversation with T. Koch on March 5, 2004 in anticipation of litigation." <u>If the Defendants and their attorneys really believed that Tim Koch voluntarily resigned on March 5, why were they even anticipating litigation with the Kochs</u>?

      This construction of the lie that Tim Koch resigned is the cornerstone of this litigation. Yet because the Defendants created and facilitated the scheme with their in-house attorneys, they maintain that all information about its planning and execution is privileged. Defendants' privilege logs contain extensive notes, drafts, and memoranda between the Defendants and their attorneys regarding Tim Koch, his employment agreement and the Secondary Purchase Agreement, the meeting of March 5, and the letters that the attorneys sent to Tim Koch setting forth the fiction that Tim Koch had resigned. What happened between March 5 when Tim Koch and the Defendants discussed "negotiating" a surrender and March 10 when Defendants' attorney sent Tim Koch a "letter of resignation?" Plaintiffs cannot have any information about this because it is privileged. What is the basis for the decision that Tim Koch had resigned even

---

[1] Defendants' Supplemental Privilege Log, produced December 10, 2004, attached as Exhibit 1 to this Reply.

though he never gave the required 30 days written notice?  Privileged.  How did the Defendants decide to lock Tim Koch out of his office while he was still working for SRI?  Sorry, privileged again.[2]

This is not the law.  The Maryland courts have clearly recognized that the attorney-client privilege "impedes the full and free discovery of the truth," and have therefore held that it must be "strictly confined within the narrowest possible limits consistent with the logic of its principle."  *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir. 1984).  None of the arguments in Defendants' Opposition should obscure this central point: <u>the attorney-client privilege does not permit a party to devise a phony resignation story to wrongfully retain millions of dollars, run the whole scheme through their attorneys' offices, and then refuse to answer any questions or provide any information about it on the grounds that it is privileged</u>.

**A.      Plaintiffs' Motion is Timely**

Local Rule 104.8(a) provides that a party should file a motion to compel 30 days after receiving an inadequate response to a discovery request.  Guideline 9 to the Local Rules adds, however, that a party seeking disclosure of documents or information objected to as privileged should file the motion to compel 20 days after receipt of a privilege log.  Plaintiffs timely filed their motion on November 19, 2004.

Defendants argue that Plaintiffs' motion with respect to Interrogatory No.17 is untimely because Defendant SCS served its response to Interrogatory No. 17 on August 16, 2004.  They fail to mention that defendants URN, Webb, and Migliori served their responses to Interrogatory

---

[2]*See, e.g.,* Webb Deposition pp.106-107; Migliori Deposition pp.133-136, 145; Mikan Deposition p.108, all attached at Exhibit 2 to this Reply.

No.17 on November 12, 2004. Plaintiffs filed their Motion to Compel seven days later. There can be no dispute that the motion is timely at least as to Webb, Migliori and URN.

Defendants also argue that the motion with respect to Document Request No.18 is untimely because Defendants provided an initial privilege log to Defendants on October 22, 2004. Again, Defendants fail to mention that Plaintiffs objected immediately to the initial privilege log because it did not include subject matter descriptions.[3] Defendants agreed to provide a revised log. Plaintiffs waited for this revised log before filing their motion because they hoped that the subject matter descriptions would reveal which documents on the privilege log "relate to our dispute, and which don't."[4] Plaintiffs finally received the revised privilege log on November 4, 2004, and they filed their motion to compel 15 days later, on November 19, 2004. It turns out that even this revised privilege log was not complete. On December 10, the day that Defendants filed their Opposition, they produced still another privilege log listing three additional documents. Plaintiffs have yet to receive a privilege log covering oral communications with attorneys as is required by Guideline 9(ii)(a) of the Local Rules. In light of their repeated delays in providing the basic privilege-log information sought by Plaintiffs and required by the rules, Defendants' argument that *Plaintiffs'* motion is untimely is untenable.

**B.     Defendants' Communications With Their In-House Attorneys Are Not Privileged Because Defendants Expected That The Information Would Be Communicated To Tim Koch And His Attorney**

The law in Maryland is clear:

---

[3] Email from Chris Mead to Michelle Grant, October 22, 2004, attached as Exhibit 3 to this Reply.

[4] *Id.*

- 4 -

> If a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as the 'details underlying the data which was to be published' will not enjoy the privilege.

*Grand Jury Proceedings,* 33 F.3d at 354; *U.S. v. Under Seal,* 748 F.2d 871, 875 (4th Cir. 1984). *See also, In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir. 1984). Defendants' admit in their Opposition that "Defendants had received emails from Koch for which they had engaged counsel to respond."[5] That statement alone resolves the privilege issue. Defendants wanted to respond to Tim Koch's emails of March 7 and 8 and his letter of March 12. They wanted to communicate to him their newfound position that he had resigned. The privilege log reveals that they communicated extensively with their attorneys as the attorneys were preparing Tim Ryan's March 10 and 12 letters to Tim Koch and his subsequent letters to Lee Lundy. They provided information by email, had meetings, the attorneys took notes, and the Defendants reviewed drafts of the letters. Defendants knew that the information would be made revealed to Koch and they specifically intended that it would be. Under black letter Maryland law, the letters, drafts of the letters, notes made in order to prepare the letters, and any communications underlying the letters are not privileged and must be produced. *Under Seal,* 748 F.2d at 875; *In re Grand Jury Proceedings,* 727 F.2d at 1356.

Defendants argue that *Under Seal,* 748 F.2d at 875 somehow limited the Fourth Circuit's holding in *In re Grand Jury Proceedings,* 727 F.2d 1352. If anything, *Under Seal* expanded the Court's prior holding by specifying that the "details underlying the data" include:

> communications relating to the data, the document, if any, to be published . . . all preliminary drafts of the document, and any attorney's notes containing material

---

[5]Defendants' Memorandum In Opposition to Plaintiffs' Motion to Compel Production of Documents and Responses to Interrogatories That Defendants Claim Are Privileged at 20 n.12.

>necessary to the preparation of the document. Copies of other documents, the contents of which were necessary to the preparation of the published document, will also lose the privilege.

*Under Seal,* 748 F.2d at 875 n.7. Contrary to Defendants arguments, the Court in *Under Seal* did not limit the public disclosure rule to cases in which the sole purpose for hiring the attorney was to make a public disclosure. All that *Under Seal* held is that if a client discusses with an attorney *the possibility* of making certain representations or information public and ultimately decides, based on the attorney's advice, not to proceed with the plan, the information does not lose the privilege simply because the client originally contemplated disclosing it. *Under Seal,* 748 F.2d at 876. So, here, if the Defendants had consulted with their attorneys about how to respond to Tim Koch and ultimately decided *not* to send a letter pressing the sham resignation story then their communications would remain privileged. That did not happen in this case.

Defendants are also wrong in suggesting that this case is like *In re Grand Jury Subpoena v. Under Seal,* 341 F.3d 321, in which *the client* responded "no" on a form that he filed and the government tried to inquire as to what underlying advice he had gotten from his attorney about how to respond on the form. Here, the Defendants met with the attorneys to formulate a written response to send to Tim Koch. They discussed with the attorneys information to put in the letters, and they expected that the information would be made public. That information, and the details underlying it, is simply not privileged as a matter of law. *United States v. Tellier,* 255 F.2d 441, 447 (4th Cir. 1958)

The Fourth Circuit considered and rejected limiting the public disclosure rule as suggested by the Defendants in their Opposition. In *Grand Jury Proceedings,* 33 F.3d at 354, appellants argued that the Court should adopt the approach set forth in *Schenet v. Anderson,* 678

F. Supp. 1280, 1283 (E.D. Mich. 1988). *Schenet* held that only information actually contained in a public document is not privileged; the communications underlying the letter or public filing as well as any drafts are privileged unless they are actually disclosed in the public document. The Fourth Circuit declined to adopt the *Schenet* approach and reaffirmed the broader rule stated in *Under Seal* and *Grand Jury Proceedings*. Therefore the Court required a law firm and the client to produce all "drafts, notes, and memoranda" generated in connection with audit responses to an outside auditor and two SEC filings. 33 F.3d at 354-355.

It may be that there are a few documents on Defendants' privilege log which do not relate in any way to the letters sent to Tim Koch and his attorney. The burden is on the Defendants to identify such documents and explain why they are privileged. *Under Seal,* 748 F.2d at 876. They have not done so. Accordingly, this court should order Defendants to produce all the documents listed on their privilege logs and to respond in full to Interrogatory No.17.

**C.    The Crime/Fraud/Tort Exception To The Attorney Client Privilege Applies To Defendants' Communications With Their In-House Attorneys**

Defendants make three arguments as to why the Crime/Fraud/Tort exception to the attorney-client privilege does not apply to the information sought by Plaintiffs. All of these arguments are without merit.

First, Defendants claim that the exception does not apply to torts. They cite one case from the Maryland Court of Special Appeals which does say that the crime/fraud exception does not apply to torts. *Fraidin v. Weitzman,* 611 A.2d 1046, 1077 (Md. Ct. Spec. App. 1993). This case is not controlling, and the Maryland federal courts have reached the opposite conclusion. *See, e.g., F.C. Cycles, Int'l, Inc. v. Fila Sport, S.p.A.,* 184 F.R.D. 64, 79 (D. Md.

1998)(considering whether the "crime, fraud, tort" exception applies to allegations of tortious interference).  Indeed, the Fourth Circuit and the Maryland District Court often refer to the exception as the "crime, fraud, tort" exception.  *See, F.C. Cycles, Int'l, Inc.,* 184 F.R.D. at 79; *Chaudry v. Gallerizzo,* 174 F.R.D. 394, 403 (4th Cir. 1999); *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1220 (4th Cir. 1976).  Numerous courts that have considered this issue have concluded that the exception applies to a broader range of misconduct than simply crimes and fraud.  *See, e.g., Rambus, Inc. v. Infineon Technologies, AG,* 222 F.R.D. 280 (E.D. Va. 2004)(communications relating to destruction of documents during litigation); *Cleveland Hair Clinic, Inc. v. Puig,* 968 F. Supp. 1227, 1241 (N.D. Ill. 1996)(communications made in furtherance of "bad faith litigation conduct.")

In any event, Plaintiffs do allege that the Defendants used their attorneys to perpetrate a fraud in this case.  Whether the attorneys knew it or not, the letters that they sent to Tim Koch and his attorney contained deliberate and knowing lies designed to induce reliance and get Tim Koch to accept less money for his business.  The letters are part of a fraud on this court, designed to conceal the truth and enable Defendants to rid themselves of the Kochs without paying the millions they owed them.  That the Complaint does not contain a fraud count is irrelevant.  The Defendants can cite no case that holds that the crime/fraud/tort exception does not apply unless the Complaint contains a separate fraud count.

Second, Defendants allege that Plaintiffs have not met their burden of showing that (1) the Defendants were engaged in a fraudulent scheme when they sought the advice of the attorneys to further the scheme, and (2) the documents bear a close relationship to the scheme.  As detailed in their opening Memorandum, Plaintiffs believe that they have met this burden.  In

- 8 -

any event, Defendants' argument is based on a misunderstanding of the law. Defendants claim that Plaintiffs cannot meet their burden by asserting that the privileged documents may help prove the fraud. In fact, the Supreme Court and this Circuit have held that a Court *can* examine and rely on the disputed documents in determining whether the crime/fraud/tort exception applies. *United States v. Zolin,* 491 U.S. 554, 572(1989); *In re Grand Jury Proceedings,* 33 F.3d at 350. In other words, the documents themselves *can* be used to support that claim that the crime/fraud/tort exception applies. The Court can review the documents in camera where, as here, there is sufficient factual basis to support "a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin,* 491 U.S. at 572; *In re Grand Jury Proceedings,* 33 F.3d at 350.

This is what we know: on March 5, 2004, everyone heard Tim Koch say that he was willing to "negotiate a surrender." Immediately after the meeting, Webb left a message for Koch saying that he would try to get Koch his full earn-out. Peggy Herrick also understood that there would be negotiations and prepared a memo reflecting this understanding. Five days later, after extensive meetings and conversations with the in-house attorneys regarding Tim Koch and his contracts, Defendants' attorney wrote a letter insisting that Tim Koch had resigned. The difference between a "negotiated surrender" and a voluntary resignation is at least six million dollars. We do not know what happened in the "black box" of the attorneys' offices, but these facts alone support a good faith belief that in camera review of the documents will likely establish that the crime/fraud/tort exception applies.

Plaintiffs fully believe that an in camera inspection of the documents will reveal that the Defendants know perfectly well that Tim Koch did not resign and turn his back on millions of

dollars. They sat down and deliberately put together a scheme to say that Koch had voluntarily resigned and to lock him out of his offices so that they could keep his money. Plaintiffs believe that the communications with the attorneys will show the evolution of this scheme. There is no question that the attorneys' letters were a central component of the scheme because they were the vehicle for communicating the phony story to Tim Koch and his attorney and they now form part of the "proof" that Tim Koch resigned. Plaintiffs respectfully request that this Court conduct an in camera review of the documents on Defendants' privilege logs to confirm that the crime/fraud/tort exception to the attorney-client privilege applies in this case.

Third, Defendants insist that there is no fraud on this court, just honest disagreement and perhaps some misunderstandings. The statements at issue here are egregiously false – far from misunderstandings or oversights – and Defendants' most recent disclosures only heighten the problem. For example, Webb stated flat out that he did not discuss firing Tim Koch after August of 2003 and he did not want to fire Koch on March 5, 2004. In fact, he proposed locking Koch out of his office just days before March 5. He also discussed getting rid of Koch with Peggy Herrick in the Human Resources Department and with Bob Ziomek. The supplemental privilege log that Defendants produced on December 10, 2004, reveals that Webb sought and received advice from the in-house attorneys on this same issue on March 4, 2004, the day before the March 5 meeting. Webb lied when he said that he did not discuss this issue with anyone after August of 2003. He lied when he said that he did not want to fire Tim Koch on March 5.

Also on December 10, 2004, Defendants produced for the first time a document revealing that the Human Resources department was searching for copies of Tim Koch's employment

agreement and the Secondary Purchase Agreement *two days before* the March 5 meeting.[6] This search was underway just hours after Webb had told them that he wanted to "escalate" matters regarding Tim Koch. This document, produced over one month after the close of discovery, highlights Migliori's inaccurate testimony that the Human Resources Department was not involved in the decision to terminate Koch. It now appears that Human Resources was not only intimately involved in handling Tim Koch's termination after March 5, but that the Department was involved *even before* the March 5 meeting, reviewing both Tim Koch's employment agreement and the Secondary Purchase Agreement. The latest privilege log also reveals that Peggy Herrick and Susan Deal obtained legal advice regarding Tim Koch and these contracts the day before the March 5 meeting.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in Plaintiffs' opening Memorandum, Plaintiffs respectfully request that this Court grant their motion and direct Defendants to respond in full to Interrogatory No.17 of Plaintiffs' First Set of Interrogatories and produce the documents requested by Document Request No.18 of Plaintiffs' First Request for Production of Documents.

---

[6] Email from Peggy Herrick to Susan Deal, March 3, 2004, attached as Exhibit 4 to this Reply.

Respectfully submitted,

*[signature]*

Mark London                    #07747
Christopher B. Mead            #08661
London & Mead
Suite 320
1225 19th Street, N.W.
Washington, D.C. 20036
(202) 331-3334
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing **Reply In Support of Plaintiffs' Motion to Compel Production of Documents and Responses to Interrogatories that Defendants Claim are Privileged** to be sent via facsimile and First Class mail, postage prepaid, on the 15th day of December, 2004 to the following:

Kevin B. Bedell, Esquire
Dorsey & Whitney LLP
1001 Pennsylvania Avenue, N.W.
Suite 400 South
Washington, D.C. 20004
*(fax: 202-442-3199)*

Marianne D. Short, Esquire
Michelle S. Grant, Esquire
Dorsey & Whitney LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498
*(fax: 612-340-2807)*

*[signature]*

Christopher B. Mead

- 12 -